1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

PEARL THOMAS,

                      Plaintiff,

    v.

AMAZON.COM, INC., AMAZON WEB
SERVICES, INC., and KEITH DURJAVA,
in his individual and professional capacities,

                      Defendants.

No.

COMPLAINT FOR DAMAGES

JURY DEMAND

Plaintiff Pearl Thomas ("Plaintiff" or "Ms. Thomas"), by and through her undersigned

counsel, Wigdor LLP, as and for the Complaint in this action against Defendants Amazon.com,

Inc. ("Amazon.com"), Amazon Web Services, Inc. ("AWS") (together "Amazon" or the

"Company"), and Keith DurJava, in his individual and professional capacities ("Mr. DurJava")

(collectively, "Defendants"), hereby states and alleges as follows:

**<u>PRELIMINARY STATEMENT</u>**

1.      When a company's Human Resources ("HR") organization's top priority

appears to be the protection of managers from the consequences of their alleged discriminatory

conduct, no matter how despicable, it is hard to see how that HR department will ever improve

the workplace.  If HR aids and abets retaliation and covering up employee allegations of serious

COMPLAINT – 1

racial harassment, managers who are inclined towards such conduct naturally will be emboldened.

2.      When Pearl Thomas joined Amazon as a Human Resources Partner, she had no idea that, after less than a year with the Company, she would encounter some of the worst abuse and displays of racial discrimination that she has encountered in her life and decades-long career in HR.

3.      Pearl Thomas was working in a job she enjoyed when Amazon approached her in June 2020 about joining its Human Resources ("HR") organization.

4.      Ms. Thomas had heard negative things about Amazon as a place to work for Black people.  After she was assured that things would turn out fine, she took the leap due to Amazon's reputation as one of the 21st Century's budding corporate titans and her hope that, through hard work and demonstrating her value, she could overcome any obstacles posed by general systemic biases.

5.      Ms. Thomas got along well with her first manager, and she stayed true to her convictions by being outspoken on the needs of Black employees and raising concerns about insensitive terminology where necessary.  All in all, during her first six months at Amazon, Ms. Thomas felt that she could make a career at the Company.

6.      Ms. Thomas is a Black woman over the age of 60, and new managers assigned to her in early 2021 have treated her with discriminatory contempt and heavy retaliation based upon her prompt complaints in response to this treatment.

7.      In addition, Ms. Thomas has been personally impacted by the Company's widespread practice of hiring Black and female employees into job levels lower than those for

COMPLAINT – 2

which they are qualified or which would, in fact, align with their actual job duties upon coming to work at Amazon.

8.     Ms. Thomas was actively recruited to join Amazon from an employer where she had a secure, successful position and career.  In almost a year at Amazon, Ms. Thomas has worked on a wide range of HR functions and successfully handled many sensitive situations while also helping to launch several initiatives.

9.     Despite her impressive background, outgoing personality, and demonstrated skillset, new managers recently assigned to Ms. Thomas have treated her with undisguised contempt, insults, and hostility.   When she sought help from HR, the Company's representatives dismissed her concerns and turned them around to accuse her of acting improperly.

10.     In January 2021, Ms. Thomas was informed that she was being reassigned to a new team—the Builder Experience Team ("BeXT")—under Keith DurJava (HR Manager, BeXT Service Delivery).  In Mr. DurJava, she suddenly faced hostility, hate, and retaliatory fury that she had never before experienced as a Black woman in the workplace.

11.     Shortly after she made legally protected complaints about racially hostile conduct by Mr. DurJava and another manager, Ms. Thomas was placed in the Company's Focus performance improvement process, which is commonly known as part of the process used to exit troublesome employees from Amazon.

12.     This move by Mr. DurJava was transparent retaliation and happened only one week after Ms. Thomas's formal transition from the Serverless Application Model  ("SAM") team to BeXT in the Machine Learning division.

WIGDOR LLP
85 Fifth Ave ● New York, NY 10003
Phone (212) 257-6800 ● Fax (212) 257-6845

13.     This blatant retaliation also came just two weeks after Ms. Thomas informed HR employee Aarean Wooten that Mr. DurJava had uttered the phrase "**damn nigger**" before they had both ended a Chime video meeting on or around March 26, 2021.

14.     Ms. Thomas heard Mr. DurJava use this slur clear as a bell; it was unmistakable, and she had an immediate, sickened reaction at his egregious statement.  It made her feel, in her words, "broken."

15.     Sadly, Ms. Thomas knows exactly what it sounds like to have the most hateful word in the English language hurled at her, as one day while standing outside her home, a white man driving by yelled "Black lives matter, nigger!" at her out his car window.  Never did she think she would hear it at work.

16.     In other meetings, Ms. Thomas and another Black female employee were told by an Amazon General Manager that **"You don't want to be an angry Black woman."**

17.     When Ms. Thomas complained to HR about the discriminatory treatment to which she was subjected, an HR employee insultingly said, **"I know there's a lot going on right now with Black Lives Matter and that's probably impacting you emotionally."**

18.     Across her decades-long career, Ms. Thomas has never experienced stress like she had at Amazon during the first half of 2021, and she needed to seek medical treatment and therapy for her work-related stress.

19.     Extraordinarily, the HR person—who Ms. Thomas told about the incident with Mr. DurJava a few days later on or around April 1, 2021—reacted by saying that she was sure Mr. DurJava did not know Ms. Thomas was still on the Chime when he said what he had said.

20.     This total lack of responsiveness and action by "HR for HR" was only the exclamation point on a pattern that Ms. Thomas has observed on the part of some members of

HR at Amazon during her tenure.  Her position in the Company's HR organization has given her a prime vantagepoint regarding both systemic discrimination and conscious animus towards Black employees at Amazon, along with the Company's practices regarding diversity, employee complaints, and the use of performance management to retaliate against Black and other employees who raise concerns.  Ms. Thomas also has been approached by several colleagues who have affirmed her experiences, the fact that such conduct is racially discriminatory, and that the Company is generally indifferent to or hostile towards employees' reports.

21.     Amazon has an opportunity to sincerely examine its policies and practices and enact meaningful change, as Institutional Shareholder Services, a proxy firm, is recommending that Amazon investors vote in favor of an independent racial audit.  The vote is set for May 26, 2021 at the Company's annual shareholder meeting.  Amazon, however, is asking shareholders to reject the audit.  See https://www.seattletimes.com/business/amazon-investors-urged-by-proxy-firm-to-vote-in-favor-of-racial-audit/ (last accessed May 18, 2021).

22.     Defendants' conduct violated Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), and the Washington Law Against Discrimination, Wash. Rev. Code § 49.60.010, *et seq.* ("WLAD").[1]

---

[1]     This case, filed by Pearl Thomas, is being filed simultaneously with the cases of other female employees similarly subjected to unlawful discrimination, bias and retaliation at Amazon: Diana Cuervo v. Amazon, et al. (U.S. District Court, Western District of Washington) (race, national origin, gender discrimination and retaliation);Tiffany Gordwin v. Amazon, et al. (U.S. District Court, District of Arizona) (race, gender discrimination and retaliation); Emily Sousa v. Amazon, et al. (U.S. District Court, District of Delaware) (race, national origin, gender discrimination and retaliation); and Cindy Warner v. Amazon, et al. (U.S. District Court, Central District of California) (gender discrimination and retaliation).

COMPLAINT – 5

**ADMINISTRATIVE PREREQUISITES**

23.    Ms. Thomas will file a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII").

24.    Upon the EEOC's completion of its investigation into Ms. Thomas's charge of discrimination and/or its issuance of a Notice of Right to Sue, Plaintiff will seek leave to amend this Complaint to add Title VII claims against Amazon.

25.    Any and all other prerequisites to the filing of this suit have been met.

**JURISDICTION AND VENUE**

26.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343, as this action involves federal questions regarding the deprivation of Plaintiff's rights under Section 1981.  The Court has supplemental jurisdiction over Plaintiff's related claims arising under state and/or local law pursuant to 28 U.S.C. § 1367(a).

27.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) as a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

**PARTIES**

28.    Plaintiff Pearl Thomas is a resident of the State of Washington and a current employee of Amazon.  At all relevant times, Plaintiff met the definition of an "employee" under all applicable statutes.

29.    Defendant Amazon.com, Inc. is a Delaware-registered domestic corporation with operations in the State of Washington.  At all relevant times, Defendant Amazon.com, Inc. met the definition of "employer" under all applicable statutes.

WIGDOR LLP
85 Fifth Ave ● New York, NY 10003
Phone (212) 257-6800 ● Fax (212) 257-6845

30.     Defendant Amazon Web Services, Inc. is a Delaware-registered domestic corporation with operations in the State of Washington.  At all relevant times, Defendant Amazon Web Services, Inc. met the definition of an "employer" under all applicable statutes.

31.     Defendant Keith DurJava is, upon information and belief, a resident of Washington and currently works for Amazon, where he supervised Ms. Thomas during her employment at the Company and controlled the terms and conditions of her employment.  At all relevant times, Defendant DurJava met the definition of an "employer" under all applicable statutes.

## FACTUAL ALLEGATIONS

## I.      MS. THOMAS WAS RECRUITED TO AMAZON FROM A SECURE, WELL-PAID POSITION AMID A SUCCESSFUL CAREER IN HR MANAGEMENT

32.     Ms. Thomas is a Black woman in her mid-60s and was working as a Senior HR Business Partner for Wireless Advocates when she was recruited by Amazon to work in AWS's HR support functions in June 2020.

33.     Before accepting a job offer from Amazon, Ms. Thomas had worked as an HR professional for over 15 years (mostly in senior-level positions), with well over 20 years in the HR field generally.  She previously worked at Microsoft as an HR Business Partner for several years, where her areas of responsibility included, *inter alia*, implementing training and performance feedback programs, promoting diversity, leading employee relations investigations, and training managers.

34.     Ms. Thomas also worked for several years in positions in which she oversaw the full recruitment process for employees, implemented executive bonus programs, and served for two years as an HR Director with 12 direct reports, overseeing all of her employer's HR functions.

WIGDOR LLP
85 Fifth Ave ● New York, NY 10003
Phone (212) 257-6800 ● Fax (212) 257-6845

35.     Other notable aspects of Ms. Thomas's varied experience and professional background include being a former Miss Black Washington (1984), the Second Runner-Up for Miss Black America (1985), and hosting and producing local television shows in the Seattle area (Action Inner City and Pearl's Place—both of which were public affairs, local lifestyle, and reviews shows).

36.     In order to join Amazon, Ms. Thomas had far more interviews than the typical Amazon candidate is put through.

37.     She had strong reservations about coming to Amazon due to its reputation as an organization where Black employees and other persons of color find it hard to succeed.

38.     She was swayed by the reassurances of the recruiter and Amazon employees, who assured her that concerns about the culture and an uneven playing field at Amazon were untrue.

39.     However, she was hired at Level 5 as a Human Resources Partner by Amazon despite the fact that her job experience (and eventual performance and duties) was more in line with Level 6 and arguably even Level 7, particularly given her years of experience, including in HR functions with technology firms.

40.     Indeed, once Ms. Thomas began work at Amazon, as a result of her experience and skill set, she quickly found herself working directly with Level 8 employees (such as General Managers and Vice Presidents) and doing work performed by HR employees higher than Level 5 (which would also come with higher compensation).

41.     Ms. Thomas left a job paying up to $140,000 a year to work at Amazon, where her first year's compensation (including her equity, which has not yet fully vested) will total around $110,000.

WIGDOR LLP
85 Fifth Ave ● New York, NY 10003
Phone (212) 257-6800 ● Fax (212) 257-6845

42.     However, she took the leap after being led to believe that, once she began work at Amazon, she could quickly move up and regain her previous level of compensation and then some once she was elevated to a job level commensurate with her experience.

## II.     MS. THOMAS IS TRANSFERRED AND HER NEW MANAGERS SUBJECT HER TO ABUSIVE DISPARATE TREATMENT AND A HATEFUL EPITHET, DEMONSTRATING RACIAL AND RETALIATORY ANIMUS

43.     Over the course of 2020, Ms. Thomas was outspoken on issues concerning the Company's Equal Employment Opportunity ("EEO") and diversity policies and practices, advocating for the needs of Black employees and identifying the Company's deficiencies in its Inclusion, Diversity and Equity ("IDE") measures.

44.     Further, in an HR all-hands meeting in or around September 2020, the phrase "monkey in the middle" was used in a context that was problematic, and Ms. Thomas immediately noted this to her manager at the time.  The employee involved issued an apology a couple of days later.

45.     At other times, in meetings with various members of Leadership present, the statement that, **"You don't want to be an angry Black woman,"** was used insensitively.  In one instance, Ms. Thomas and another Black female employee were cautioned by a General Manager that they needed to be mindful of their tone in order to avoid being perceived as an "angry Black woman."

46.     Ms. Thomas believed that the organization, while far from perfect, could be one where she would make headway and she enjoyed working with her manager and teammates in the Serverless Application Model ("SAM") Organization and IoT (Internet of Things).

47.     On or around January 5, 2021, Ms. Thomas was transferred in Amazon's system to BeXT.  However, she and the entire WJV Organization (Bill Vass's org within SAM) team

COMPLAINT – 9

were told by HR Director Almudena Capell that all of her reporting and job functions would remain the same through the end of the first fiscal quarter and that she would only make the functional transfer to BeXT on or around April 5, 2021.

48.    In or around February 2021, Ms. Thomas began working with Stephanie Downey, a Senior HR Business Partner, in connection with Ms. Downey's transition onto and Ms. Thomas's transfer off of the IoT team.  From the start, Ms. Downey took a condescending, confrontational approach with Ms. Thomas, talking down to her and making embarrassing comments to and about Ms. Thomas on Leadership calls.

49.    By way of example, Ms. Downey stated, "Well, I know you're not very good at this," and "Well, you do know how to do this?" in an outwardly unpleasant and insulting tone.

50.    On or around February 8, 2021, Ms. Downey said to Ms. Thomas, without any prompting, **"I know there's a lot going on right now with Black Lives Matter and that's probably impacting you emotionally."**

51.    This comment, combined with Ms. Downey's consistent hostility (speaking to Ms. Thomas in a stereotypically superior, skeptical manner) confirmed that Ms. Downey's conduct was racially charged and driven by bias and prejudice.

52.    Another employee stated that they had experienced the same type of racially charged treatment and "vibes" from Ms. Downey.

53.    Ms. Thomas complained to Mr. DurJava about Ms. Downey's offensive conduct and disparate treatment.

54.    Rather than assisting her in resolving this situation, Mr. DurJava told Ms. Thomas to talk with Ms. Downey about it herself, and stated: "Don't worry about her, you only

WIGDOR LLP
85 Fifth Ave ● New York, NY 10003
Phone (212) 257-6800 ● Fax (212) 257-6845

need to put up with her for two more weeks.  But you need to reach out to her to let her know how you feel."

55.     Ms. Thomas, as directed, told Ms. Downey that she felt that her manner was racially charged and motivated.  Ms. Downey acted shocked and perturbed, saying "I can't believe you'd say that.  I feel that I have to walk around on eggshells around you."

56.     Ms. Downey's reaction confirmed that her poor treatment of Ms. Thomas derived from a perception of her as easily upset or offended and prone to playing a so-called "race card."

57.     Another Black employee stated that she had been told to "watch out for Stephanie [Downey]," and told Ms. Thomas she had personally been subjected to racially disparate treatment by Ms. Downey.

58.     Ms. Thomas advised Mr. DurJava that another employee had reported similar interactions with Ms. Downey.  Mr. DurJava, without Ms. Thomas's knowledge or consent, contacted HR (specifically, the "HR for HR" group) to discuss her concerns, but did nothing about what she had reported regarding the other employee's experiences with Ms. Downey (*i.e.*, the person who told Ms. Thomas to "watch out").

59.     Mr. DurJava's unwillingness to remedy this clearly (at a minimum) inappropriate conduct by Ms. Downey was in keeping with his general disregard for Ms. Thomas.

60.     From the beginning of their working relationship, Mr. DurJava went to great lengths to avoid interacting with Ms. Thomas, failing to respond to several messages sent *via* email/Chime and other requests for 1:1 meetings with him.

COMPLAINT – 11

61.     Indeed, Ms. Thomas immediately sensed Mr. DurJava's strong aversion to her on the few occasions when she was able to get "face time" with him.

62.     During the 20-minute meetings that did take place between Ms. Thomas and Mr. DurJava, he did not have any significant negative feedback from others or say anything regarding a purported failure by Ms. Thomas to meet performance expectations.

63.     On or around March 26, 2021, Ms. Thomas participated in a transition meeting *via* video call with Mr. DurJava and Ms. Downey, including discussing a document called the "Return to Work Manager Checklist."  Both Ms. Downey and Mr. DurJava tore into and aggressively cross-examined Ms. Thomas throughout the meeting, with Mr. DurJava acting peevish and brusquely asking questions in rapid succession such as, *inter alia*, "What is the purpose of this meeting?" and "What is your expected outcome?"

64.     Ms. Thomas believed that her very purpose at the organization was being aggressively called into question without justification and that she was being treated like an enemy rather than a colleague.  Each line of the document that they reviewed triggered a fresh confrontation.  It felt strongly as though Ms. Downey and Mr. DurJava were actively seeking items on which to criticize and find fault with Ms. Thomas.

65.     As the meeting ended, Ms. Thomas did immediately hang up, and Mr. DurJava angrily grumbled, **"Damn nigger,"** before his own audio cut off and he hung up.

66.     Ms. Thomas had an instant visceral reaction, in the literal sense.  She felt sick to her stomach and fell out of her chair onto her knees.  Her guts were so queasy that she took something to settle her stomach.  She said to herself out loud, "God help me."

67.     Ms. Thomas found it hard to wrap her mind around how such hate could exist in anyone she works with, and in the corporate ranks of a company like Amazon, no less.  She

WIGDOR LLP
85 Fifth Ave ● New York, NY 10003
Phone (212) 257-6800 ● Fax (212) 257-6845

felt hit, harmed, afraid, degraded, alone and abandoned, and simply thunderstruck to have heard this word in reality and on a work call.

68.     Ms. Thomas had only once before heard that word in person used in such a deliberately hateful way.  To be clear, this was not Mr. DurJava using the term "nigga" in a put-on hip hop patois or some such usage (which would still be completely unacceptable); this was the word with a hard "r" at the end and she heard it as clearly as any other word he had said on the call that day.

69.     The "n-word" has no equal in the English language for its capability to de-humanize and verbally spit upon a Black person.  No other slur affects any other group in the same way, to the same degree.  No other word has the same centuries-long history as an instrument of hate and oppression.  It is unique in its power.

70.     Following this incident, Ms. Thomas thought that if her new supervisor thought of her this way, her fate at the Company must be sealed—she felt doomed.

71.     She also felt betrayed and foolish, as she had all along been facilitating inclusion town halls, HR Self-care All-hands and campaigns for the recruiting department for this Company and her team.

72.     After Mr. DurJava's derisive and sneering use of the "n-word," Ms. Thomas's thoughts raced.  She immediately called her doctor's office to make an appointment and seek counseling with a new therapist.  Ms. Thomas told her therapists and doctor about the precise details of what Mr. DurJava has done and said.

73.     A few days later, on April 1, 2021, Ms. Thomas talked with Aarean Wooten. Ms. Thomas squarely told Ms. Wooten about Mr. DurJava's blatant use of the word "nigger," referring to her during a work meeting.  Ms. Wooten unhelpfully told Ms. Thomas that Mr.

WIGDOR LLP
85 Fifth Ave ● New York, NY 10003
Phone (212) 257-6800 ● Fax (212) 257-6845

DurJava "must not have known you were still on the phone."  Incredibly, Ms. Wooten entirely

ignored the virulent animus that would motivate a person to use that language in any context

and glossed over Mr. DurJava's inexcusable behavior.

74.     Then, although Ms. Wooten was supposed to be acting as "HR for HR," she

began to question Ms. Thomas as though she were suddenly an enormous threat.  In an internal

email, Ms. Thomas described Ms. Wooten's approach as: "harsh, insensitive and you

interrogated me, questioning me as if I was a criminal."

75.     Among other things, Ms. Wooten told Ms. Thomas that, "First you complained

about Stephanie, now you're complaining about Keith—it's starting to look like you can't get

along with anyone."  This statement also demonstrates very strong retaliatory animus against

employees who report discriminatory conduct and was factually absurd as well—Ms. Thomas

has worked with dozens if not hundreds of people at Amazon and has forged many close

relationships even during her relatively short time at the Company.

76.     Ms. Thomas was shocked by this hostile reaction to what she had reported,

especially from someone whose entire function was, supposedly, to support employees in

situations like this one.

77.     Ms. Thomas tried to stop Ms. Wooten's efforts to confuse the issue or dissuade

her from pressing the issue, saying, "I'm not the person on trial, my name is not Derek

Chauvin."  Ms. Wooten later used this statement against Ms. Thomas, offensively suggesting

that Ms. Thomas was simply upset by current events.

78.     Ms. Wooten also gave the totally inadequate "advice" that Ms. Thomas should

try to "keep her head down," do her work, and follow Mr. DurJava's directives.  Ms. Thomas

understandably reacted by confirming what she had advised and saying that she had to "do

WIGDOR LLP
85 Fifth Ave ● New York, NY 10003
Phone (212) 257-6800 ● Fax (212) 257-6845

what the massah says" (particularly understandable in light of the fact that she had just told Ms. Wooten that this supervisor had used the n-word).

79.     Ms. Wooten later threw this statement back against Ms. Thomas as well.  Ms. Wooten's impulses to downplay Ms. Thomas's complaints of racial bias and weaponize her own statements against her are consistent with the retaliatory animus and acts of Mr. DurJava, Ms. Downey, and various other members of Amazon management.

80.     During her conversation with Ms. Wooten, Ms. Thomas's breathing became labored, and she was manifestly in distress and began to experience chest pain.  Ms. Thomas advised Ms. Wooten of what was happening (though it should have been obvious as she was breathing very heavily with chest rising dramatically and had her hand on her chest).  Yet, Ms. Wooten continued the call.

81.     Again, Ms. Wooten later tried to turn this around on Ms. Thomas, saying that she stayed on because Ms. Thomas supposedly had kept talking (as though she is incapable of ending a call or interview with an employee who clearly needs a break or even emergency medical assistance).

82.     The great emotional and even medical impact displayed by Ms. Thomas is borne out by Ms. Wooten's April 2, 2021 email to Ms. Thomas, in which she wrote **"I understand this is a difficult time with everything going on externally in the media, so please explore the resources below if needed,"** and included links to the Company's Employee Assistance Program ("EAP") and leave options.

83.     Again, Ms. Wooten deflected and disgustingly blamed Ms. Thomas's distress on the Chauvin trial and other events in the news.  Ms. Wooten's trivialization of Ms. Thomas's

COMPLAINT – 15

WIGDOR LLP
85 Fifth Ave ● New York, NY 10003
Phone (212) 257-6800 ● Fax (212) 257-6845

report of blatant racial harassment is a textbook example of gaslighting, and is a complete and total dereliction of the Company's duty to its employees.

84.     Unsurprisingly in light of Ms. Wooten's earlier conduct, it took only a few days for her to tell Ms. Thomas on April 6, 2021 that her reports of racially discriminatory conduct had been found to be unsubstantiated.

85.     Somehow, Ms. Wooten's "investigation" was completed without requesting any further information from Ms. Thomas after other individuals were interviewed (if, that is, anyone was subject to true investigatory interviews).

86.     Ms. Thomas also went to Senior Manager Jim Handorf for help, and at one point in late March 2021, Mr. Handorf advised Ms. Thomas to try to bond with Mr. DurJava and talk with him since "his job is to teach you and train you."  On April 1, 2021 Ms. Thomas tried humor, and said on a call with Mr. DurJava, "Hey, I'm pregnant."  Mr. DurJava's instant, flat response: "Well, that's impossible."

87.     As a result of this unlawful discriminatory and retaliatory treatment, which clearly was geared towards forcing her out of her job, Ms. Thomas has sought treatment from a therapist, her physician, and received a new prescription for anti-anxiety medication.

**III.    MANAGEMENT RATCHETS UP THE PRESSURE ON MS. THOMAS, SENDING FALSE EMAILS TO MISCHARACTERIZE DISCUSSIONS, AND ANNOUNCING THAT MS. THOMAS IS IN THE "FOCUS" PERFORMANCE PROGRAM DAYS AFTER SHE REPORTED MR. DURJAVA'S REPUGNANT RACIAL CONDUCT**

88.     Amazon and Mr. DurJava have continued through the date of this Complaint to increase the pressure and heat on her (including throughout Friday, May 7, 2021, peppering her with emails about supposed deficiencies that were easily refuted, demonstrating their pretextual nature) in a bid to get her to leave the Company.

WIGDOR LLP
85 Fifth Ave ● New York, NY 10003
Phone (212) 257-6800 ● Fax (212) 257-6845

89.     The retaliatory intent behind Mr. DurJava's critical, micromanaging emails was clear, as the rate of his emails to Ms. Thomas increased in frequency and urgency in the hours after she declined the Company's unsolicited offer for her to take paid administrative leave.

90.     Ms. Thomas has discussed the Company's long and well-documented history of discrimination against Black employees with several other Amazon employees, both current and former.  By way of example only, one white employee outright told Ms. Thomas that "Keith is treating you this way because you are Black."

91.     Another example of disparate treatment (which echoed concerns of other Black employees) occurred when a coworker stated that Black employees who do well at Amazon generally find that they are not well thought of by the upper ranks.

92.     Ms. Thomas's colleagues, including Black coworkers, also have confirmed the Company's use of performance management plans to exit employees who are seen as troublesome, as well as the disproportionate use of low performance ratings against persons of color.

93.     Employees who complain about disparate treatment, such as being spoken to condescendingly, are often managed out of the Company using the Focus/Pivot "performance management" process.  Through her extensive HR background, in addition to guidance received at Amazon itself, Ms. Thomas is personally aware of the common gambit of making performance improvement goals vague or unattainable enough so that an employee can be exited at the end of the Focus process, regardless of the employee's actual performance.

94.     Sure enough, Ms. Thomas has become the target of this *modus operandi*.

95.     On or around April 15, 2021, Mr. DurJava (whose transition to becoming Ms. Thomas's supervisor was completed only on April 5, 2021) told Ms. Thomas that she had been

WIGDOR LLP
85 Fifth Ave ● New York, NY 10003
Phone (212) 257-6800 ● Fax (212) 257-6845

placed on "Focus" performance improvement status.  This meant that she was now effectively prohibited from transferring away from Mr. DurJava (without express approval by a Vice President, who almost certainly would talk with Mr. DurJava about it), and her prospects at the Company were severely compromised, as Focus also affects eligibility for promotion, among other terms and conditions of employment.

96.     Indeed, Mr. DurJava told Ms. Thomas that he could not support her transfer to a new team (further showing his desire to get her out of the Company altogether).  Ms. Thomas told Mr. DurJava that she felt she might need to seek outside assistance in dealing with her situation at the Company.  Mr. DurJava abruptly responded, "I have to go," and hung up.

97.     After this, Ms. Thomas swiftly received an email from Ms. Wooten, saying she had heard that Ms. Thomas might seek outside help (careful to say she was free to do that) and checking in to see if she had any concerns that had not been addressed.  Needless to say, Ms. Thomas did indeed have many concerns that had gone unaddressed, but Ms. Wooten had more than proven herself to be a dead end in remedying the discrimination against Ms. Thomas.

98.     Shockingly, Mr. DurJava had placed Ms. Thomas in Focus after working with her for barely three months (and barely a week after becoming her supervisor formally), and without the usual counseling steps or performance ratings (such as rating someone "Least Effective") that HR employees in particular are expected to observe or use before placing an employee in Focus.

99.     Mr. DurJava's placement of Ms. Thomas in the Focus program meant that both of his two Black direct reports at that time (Ms. Thomas and Andrew Henry-kennon) were on performance improvement plans ("PIPs").  Neither of Mr. DurJava's two white reports were on PIPs.  Due to the lack of any satisfactory action by Ms. Wooten, Ms. Thomas sent an email

WIGDOR LLP
85 Fifth Ave ● New York, NY 10003
Phone (212) 257-6800 ● Fax (212) 257-6845

to another member of HR, Andrea Seitz, Principal PM for AWS IDE, seeking her help with the situation.  Ms. Seitz and her manager attempted to assist, but to no avail.

100.     April 15, 2021 was to become one of the worst days of Ms. Thomas's life.  Later on the same day that she was told she was in "Focus," a young woman who Ms. Thomas raised as her own daughter for ten years was found dead in the bedroom of her fiancé's home, with blood coming from her nose and mouth, her fists clenched and eyes wide open.  The family is still awaiting the results of an autopsy to determine the cause of death, and her service and homegoing (and preparations for them) took place during the week of April 26 and weekend of May 1-2, 2021.

101.     Ms. Thomas felt as though her world was coming apart.

102.     On April 16, 2021, the very next day, despite the horrible pressure she was under and unfathomable tragedy she was facing, Ms. Thomas found the wherewithal to email Ms. Wooten.  The Company's pressure was unrelenting, and so Ms. Thomas had to respond. In a detailed message, she noted to Ms. Wooten that, "As you know as a result of the investigation I have now been placed in FOCUS as of 4/15."

103.     Ms. Thomas was never told why she was placed in Focus, apart from a false claim that she had previously been subject to coaching.  This retaliatory, supposed performance improvement measure also was imposed on her without any of the usual lead-up or discussion with the employee that managers, especially in HR, are supposed to engage in before taking that step.  In addition, and tellingly, Ms. Thomas has not been told what her performance goals or areas for improvement under Focus supposedly are.

104.     Ms. Thomas recognized from the beginning that being placed in Focus was transparent retaliation for her legally protected complaints to Mr. DurJava and Ms. Wooten.

WIGDOR LLP
85 Fifth Ave ● New York, NY 10003
Phone (212) 257-6800 ● Fax (212) 257-6845

She also emailed Mr. DurJava about her need for bereavement leave for the death of her daughter, and he directed her to fill out a "trouble ticket" in order to be cleared to take the leave from work.

105.     Peers and managers within Amazon were puzzled and appalled Ms. Thomas's placement in Focus.  Indeed, Ms. Thomas received many messages of support, and several colleagues have written messages praising her performance and advocating for her to be taken out of Focus.

106.     One manager remarked to Ms. Thomas that, "You don't sound like a person who is underperforming.  This all sounds too strange to me."

107.     Furthermore, Ms. Thomas is aware of at least three other Black employees (two women, one man) who have in the past few months been railroaded out of jobs in HR at Amazon.  These employees confided in Ms. Thomas, respectively, that they also were placed in Focus without knowing it, had their performance mischaracterized, and/or were subjected to retaliation or reprisals after returning from leave.

108.     Even in the wake of Ms. Thomas's family tragedy, Ms. Wooten sent a gratuitous email on April 21, 2021 that mischaracterized her discussions with Ms. Thomas, including making the ridiculous claim that Ms. Thomas had supposedly denied that she had been subjected to racism or discrimination (despite, in the same email, stating that Ms. Thomas had come to her with complaints of discrimination).

109.     If there were any basis at all for Ms. Wooten's characterizations (a generous assumption), it would appear to be the product of the type of tactical questioning and selective quotation that is all too typical of corporate investigations that are meant to insulate a company from liability rather than to genuinely probe and illuminate an employee's complaints.

WIGDOR LLP
85 Fifth Ave ● New York, NY 10003
Phone (212) 257-6800 ● Fax (212) 257-6845

Needless to say, Ms. Thomas disagrees completely with Ms. Wooten's depiction of their discussion in that communication.

110.     On April 22, 2021, Ms. Thomas received a letter from her physician, Dr. Virginia Morris, to be provided to Amazon, which states in part: "At this time we are requesting increased breaks during the day, decreased work hours during a panic attack, and increased flexibility around communication deadlines with team members. We are aware that Ms. Thomas has been put into FOCUS and are requesting a diverse team of individuals to participate in support, training, and evaluation during this process."

111.     Ms. Thomas promptly provided this letter to the Company, yet nothing has been done to alleviate her workload or schedule.  Instead, Mr. DurJava has been working hard to burden Ms. Thomas with even more and to ride her with constant demands and scrutiny. Particularly for an HR professional like Mr. DurJava, who knows better, this is undisguised retaliation.

112.     Despite this clear warning from her doctor regarding Ms. Thomas's health and medical accommodation needs, Mr. DurJava has ratcheted up the pressure, seemingly smelling blood and vulnerability.  He recently has heaped assignments on Ms. Thomas that require her to work 14-hour days.

113.     Indeed, several colleagues have noted that Ms. Thomas's remit of areas comprised of more than 1500 employees is far too much for one person (the general rule of thumb is that an employee at Ms. Thomas's level covers around 500 employees).  In fact, coworkers have acknowledged to Ms. Thomas (including on communications with Mr. DurJava) that her area of responsibility has been made far too broad and is beyond what could reasonably be expected from one person.

COMPLAINT – 21

114.    Mr. DurJava's retaliation continues through the date of this Complaint.  On May 7, 2021, for example, Mr. DurJava sent a blizzard of rapid-fire emails to Ms. Thomas in a transparent attempt to overwhelm her.  He did this despite her April 22, 2021 doctor's note and the death of her daughter on April 15, 2021.  This is cold-blooded callousness that one would not expect to see someone visit upon their worst enemy.

115.    Mr. DurJava's marked, conspicuous shift in approach to quickly try to manufacture a paper trail after Ms. Thomas said she was seeking legal counsel shows a clear progression of retaliatory tactics.  At times, Mr. DurJava's actions were so extreme and cruel that other employees interceded on behalf of Ms. Thomas.  Mr. DurJava's conduct further cements the obvious conclusion that Ms. Thomas is being targeted for retaliation and the Company is working hard to force her out due to her legally protected discrimination complaints.

116.    It is particularly glaring that Mr. DurJava's emails increased in volume in the hours after she declined to take paid administrative leave.

117.    On May 6, 2021, Mr. DurJava told Ms. Thomas that he would not meet with her individually going forward, hostilely stating that, "Given the differences in our recollection of our 1:1 meetings, I am going to bring in another member of HR to attend our 1:1s."  Naturally, this supposed "witness" would only serve the purpose of backing up Mr. DurJava's desired narrative and is yet another example of disparate treatment and retaliation.

118.    In an email sent on May 4, 2021, Mr. DurJava listed a project, Ingenii, as needing to be completed by Ms. Thomas by Friday, May 7, 2021.  In fact, Ms. Thomas had already completed that task around or at least two weeks before.  Again, Mr. DurJava appeared to be casting about for things to use against Ms. Thomas.

WIGDOR LLP
85 Fifth Ave ● New York, NY 10003
Phone (212) 257-6800 ● Fax (212) 257-6845

119.    In the same May 4, 2021 email to Ms. Thomas, Mr. DurJava also noted that Ms. Thomas has expressed concerns that she is "being pushed out of the company," which he denied was his goal.

120.    Ms. Thomas's job role and duties within BeXT also have been curtailed over the last several weeks from that of a broad HR Business Partner position to one where she is assigned miscellaneous transactional and tactical assignments.

121.    As one more retaliatory kick in the shins, Ms. Thomas also has stopped receiving and is no longer included on emails regarding finding speakers for an important upcoming HR meeting.

122.    Amid all of this, in April 2021, Ms. Thomas received a very positive performance review (known within the Company as a "Forte" review), which garnered her a pay increase at a time when it is her understanding many of her colleagues did not receive one. This clashes strongly with Mr. DurJava having placed her in Focus (much less that he did so after barely a few months of working with her, and just a week after her formal transition to BeXT and the Machine Learning ("ML") Team, and only two weeks after she reported his most serious discriminatory conduct).

123.    Among the excellent comments she received in Forte were:

- "Pearl's superpower is consistently being the most positive person in the room even while handling the most emotionally draining work, e.g. mental health and performance issues. Her team relies on her, and she always delivers. She is very good at talking to people in difficult circumstances and guiding them to do the next right thing;"

- "I can not (sic) articulate areas for Pearl to grow at this time;" and

- "I honestly believe Pearl already embodies the majority of Amazon leadership principles on an L6+ level, and has

WIGDOR LLP
85 Fifth Ave ● New York, NY 10003
Phone (212) 257-6800 ● Fax (212) 257-6845

demonstrated her abilities through challenges such as being the primary person to support employees Mental Health Crisis. (something others won't touch with a ten foot pole or would otherwise not be able to handle the load)."

124.    Ms. Thomas loves her work in HR, and during her time at Amazon she has touched the lives of many employees, including by managing and assisting many employees with mental health concerns, some who were having suicidal thoughts.  As her colleagues' comments show, Ms. Thomas is always ready and willing to work and fight hard for her coworkers.  She also is prepared to stand up for herself.

## FIRST CAUSE OF ACTION
### (Discrimination and Harassment in Violation of Section 1981)
#### *Against All Defendants*

125.    Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

126.    Defendants have discriminated against Plaintiff on the basis of her race, color, and ethnicity (Black) in violation of Section 1981 by denying her the same terms and conditions of employment available to non-Black employees, including, but not limited to, subjecting her to disparate working conditions, denying her terms and conditions of employment equal to that of her co-workers who do not belong to the same protected categories, and denying her the opportunity to work in an employment setting free of unlawful discrimination.

127.    Defendants also have discriminated against Plaintiff on the basis of her race and ethnicity in violation of Section 1981 by fostering, condoning, accepting, ratifying, and/or otherwise failing to prevent or to remedy a hostile work environment that has included, among other things, severe and pervasive discrimination.

WIGDOR LLP
85 Fifth Ave ● New York, NY 10003
Phone (212) 257-6800 ● Fax (212) 257-6845

128.    As a direct and proximate result of Defendants' unlawful discriminatory conduct and harassment in violation of Section 1981, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, including but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, as well as physical injury, for which she is entitled to an award of damages and other relief.

129.    Defendants' unlawful and discriminatory actions constitute malicious, willful, and wanton violations of Section 1981, for which Plaintiff is entitled to an award of punitive damages.

## SECOND CAUSE OF ACTION
### (Retaliation in Violation of Section 1981)
*Against All Defendants*

130.    Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

131.    Defendants retaliated against Plaintiff by, *inter alia*, unreasonably increasing her workload and placing her on a performance improvement plan which affected the terms and conditions of her employment, including her eligibility for transfer and promotion, because of her engagement in activities protected under Section 1981.

132.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages.

133.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, including but not limited to, depression, humiliation, embarrassment, stress

WIGDOR LLP
85 Fifth Ave ● New York, NY 10003
Phone (212) 257-6800 ● Fax (212) 257-6845

and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, as well as physical injury, for which she is entitled to an award of damages and other relief.

134.     Defendants' unlawful and retaliatory actions constitute malicious, willful, and wanton violations of Section 1981, for which Plaintiff is entitled to an award of punitive damages.

**THIRD CAUSE OF ACTION**
**(Discrimination and Harassment in Violation of Washington Law Against Discrimination)**
***Against All Defendants***

135.     Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

136.     Defendants have discriminated against Plaintiff on the basis of her race and color (Black) and sex/gender (female) in violation of the Washington Law Against Discrimination, Wash. Rev. Code §§ 49.60.010, *et seq.*, by, *inter alia*, denying her the right to obtain and hold employment without discrimination.

137.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the WLAD, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages.

138.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the WLAD, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, including but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, as well as physical injury, for which she is entitled to an award of damages and other relief.

WIGDOR LLP
85 Fifth Ave ● New York, NY 10003
Phone (212) 257-6800 ● Fax (212) 257-6845

**FOURTH CAUSE OF ACTION**
**(Retaliation in Violation of Washington Law Against Discrimination)**
***Against All Defendants***

139.     Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

140.     Defendants retaliated against Plaintiff by, *inter alia*, unreasonably increasing her workload and placing her on a performance improvement plan which affected the terms and conditions of her employment, including her eligibility for transfer and promotion, because of her engagement in activities protected under the Washington Law Against Discrimination. Wash. Rev. Code §§ 49.60.010, *et seq*.

141.     As a direct and proximate result of Defendants' unlawful discriminatory retaliation in violation of the WLAD, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages.

142.     As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the WLAD, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, including but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, as well as physical injury, for which she is entitled to an award of damages and other relief.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendants for the following relief:

A.     A declaratory judgment that the actions, conduct, and practices of Defendants complained of herein violate the laws of the United States and State of Washington;

WIGDOR LLP
85 Fifth Ave ● New York, NY 10003
Phone (212) 257-6800 ● Fax (212) 257-6845

B.      An award of damages against Defendants, in an amount to be determined at trial, plus interest, to compensate Plaintiff for all monetary and/or economic damages;

C.      An award of damages against Defendants, in an amount to be determined at trial, plus interest, to compensate for all monetary and/or compensatory damages, including, but not limited to, compensation for Plaintiff's emotional distress and physical injuries and harm;

D.      An award of liquidated damages equal to the amount of Plaintiff's past and future lost wages;

E.      An award of punitive damages in an amount to be determined at trial;

F.      Prejudgment interest on all amounts due;

G.      Post-judgment interest as may be allowed by law;

H.      An award of Plaintiff's reasonable attorneys' fees and costs; and

I.      Such other and further relief as the Court may deem just and proper and to which Plaintiff may be entitled under law.

WIGDOR LLP
85 Fifth Ave ● New York, NY 10003
Phone (212) 257-6800 ● Fax (212) 257-6845

## JURY DEMAND

Plaintiff hereby demand a trial by jury on all issues of fact and damages stated herein.

Dated: May 19, 2021

Respectfully submitted,

**WIGDOR LLP**

Lawrence M. Pearson
Jeanne M. Christensen
Alfredo J. Pelicci
Anthony G. Bizien
(all pending *pro hac vice* admission)

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
lpearson@wigdorlaw.com
jcrhistensen@wigdorlaw.com
apelicci@wigdorlaw.com
abizien@wigdorlaw.com

SCHROETER GOLDMARK & BENDER

JAMAL N. WHITEHEAD, WSBA #39818
810 Third Avenue, Suite 500
Seattle, WA  98104
Phone: (206) 622-8000
Fax: (206) 682-2305
whitehead@sgb-law.com

*Counsel for Plaintiff*